P. E. TRUE, Plaintiff, v. HON. FRANCIS M. HUNTER, JUDGE, Defendant.

INTOXICATING LIQUORS: Injunction—Contempt—Evidence. Evidence reviewed, and *held* sufficient to justify a judgment of conviction for violating an injunction against the sale of intoxicating liquors.

INTOXICATING LIQUORS: Presumption—Liquors in Private Residence. The finding of intoxicating liquors in a private dwelling house of a person *not* keeping a tavern, public eating house, grocery or other place of public resort, raises no presumption of illegal sale or keeping for sale.

*Certiorari to Wapello District Court.*—F. M. HUNTER, Judge.

SATURDAY, FEBRUARY 19, 1916.

THE plaintiff herein was charged with a violation of a liquor injunction, was convicted and fined, and thereupon sued out a writ of certiorari.—*Affirmed.*

*Ernest R. Mitchell,* for plaintiff.

*Elmer K. Daugherty,* for defendant.

GAYNOR, J.—This is an action in certiorari to test the legality of the action of defendant in fining plaintiff for contempt of a liquor injunction. It appears that, on the 26th day of August, 1914, a decree of injunction was duly entered, perpetually enjoining and restraining this plaintiff from the illegal traffic in intoxicating liquors on the premises described in the complainant's petition and elsewhere in the judicial district; that this decree, thereafter, and at the time of the commencement of the contempt proceedings, was in full force and effect, with the full knowledge of the plaintiff. On the 19th day of June, 1915, an information was filed before the

defendant judge, charging the plaintiff with a violation of said injunction. The judge thereupon ordered a warrant to issue for the arrest of the defendant (this plaintiff), and he was brought in on the same day to answer the charge. He answered, denying all the allegations of the complaint. On the 21st day of June, 1915, the cause was heard before said judge, and he found the plaintiff herein guilty of contempt, as charged. The plaintiff was thereupon fined and ordered committed to the jail until the fine was .paid, not to exceed the statutory time. He sued out the writ to test the legality of said action.

The contention here is that the evidence submitted to said judge did not justify the finding that the defendant (this plaintiff) was in contempt of court, and did not justify the court in assessing a penalty as for contempt.

1. INTOXICATING LIQUORS: injunction: contempt: evidence. The burden was on the State to prove the charge made, to wit, that the defendant in said proceedings (plaintiff herein) did in fact violate the injunction, as alleged in the complaint.

The evidence tends to show that the defendant is a married man, and resides in what is known as No. 616 West Mechanic Street; that he is a man of leisure and dresses well; that he has not been working at anything for over a year; that, prior to the issuance of the injunction against him, he had been in the saloon business, connected with the saloon business; that he was engaged in the liquor business with Dennis Maloney up to about the 21st day of June, 1914. Dennis Maloney resides at the corner, and in what is known as No. 602 West Mechanic Street. Mrs. Ennis, referred to in the testimony, lives at No. 608 West Mechanic Street, and owns the lot at No. 612. On the rear end of plaintiff's lot is a barn. On the rear end of Mrs. Ennis's lot, at No. 608, is an old unoccupied shed.

On the Friday preceding the trial, the chief of police of the city and another officer made a search of plaintiff's resi-

dence,. and found a sackful of beer there at the head of the stairs entering the cellar. They searched the house and cellar, but found nothing further. They were informed by Mrs. True, plaintiff's wife, that the beer belonged to her; that she was in ill health and she kept it for her own private use. The finding of this beer in the residence of the plaintiff raised no presumption that it was kept for sale in violation of law. See Section 2427 of the Code of 1897, which reads:

2. INTOXICATING LIQUORS: presumption: liquors in private residence.

"The finding of the same in unusual quantities in a private dwelling house or its dependencies of any person keeping a tavern, public eating house, grocery or other place of public resort, shall be presumptive evidence that such liquors are kept for illegal sale."

The plaintiff comes within none of the inhibited classes.

After searching the house, these officers say they saw a path leading from plaintiff's barn over through Mrs. Ennis's yard, that had been recently raked with a rake; that it had rained the night before; that they found the raked tracks up across Mrs. Ennis's yard, across No. 612 to the yard where she resided, at No. 608. These rake tracks led to an old, unoccupied building on the back of Lot 608. There appears to have been nothing that looked like liquor in the room of this old house; but at the back of this building on 608, they found a door on hinges, raised it up, and found 31 sacks of beer, each sack containing about 24 bottles. This old place was not occupied by anyone. It was an old building on the rear end of Mrs. Ennis's lot, at No. 608. We take it, it was standing in or near the alley back of her home. The tracks they followed from plaintiff's house in reaching this extended from a barn on the rear end of plaintiff's lot to this shed in which beer was found. The search was made about two o'clock in the afternoon. There is no evidence that plaintiff was ever seen in the vicinity of this building.

There seems also to be a vacant building on Mrs. Ennis's lot at No. 612. About three or four weeks previous to the search hereinbefore referred to, these officers found, in the old building at No. 612, in the cellar, 11 boxes of beer. There is evidence that men were seen drinking beer on the railroad track in the rear of these lots. Just before this first search was made, these officers "saw fellows sitting on the railroad dump along up on top of the bank near the track; these fellows came up the track, and two men went back to Dennis Maloney's place,—that is, No. 602,—and right back to Mrs. Ennis's place, 608-612, and the two men stopped down near the dump with two bottles of Golden Grain Belt beer, and when they saw the officers, they left and left some of the beer behind them".

It appears that the bottles found in plaintiff's house were in a burlap sack, and contained Golden Grain Belt beer; that the beer found in the old house at the rear end of Mrs. Ennis's lot was in the same kind of a sack and was the same kind of beer. It appears also that there is another path running from Dennis Maloney's house back of Mrs. Ennis's house. This path is farther down in the rear of the lots. It is not far from the railroad track. It starts about 50 feet inside of the right of way, and the witness says that this is the path that had been recently scratched over with a rake.

The officer with the chief gave substantially the same testimony. He gave the further testimony that when he was up there, the day before the search was made, he saw indications of persons drinking in the vicinity. We take it from his further testimony that this refers to the fellows seen by the chief drinking beer on the railroad track. He further testifies:

"I have seen persons carrying packages up in that vicinity, not around Pearl's place, but on the railroad track. I don't know where they came from. They were no nearer to True's place than the other houses in the street. The persons I saw drinking beer on the track were in the rear of Mrs.

Ennis's property. I didn't see the plaintiff there at any of the times that the searches were made, but he has the reputation of being a bootlegger."

One Smith testified that he was on the police force, and that he was up in the vicinity of the plaintiff's place and saw the plaintiff at Dennis Maloney's about 12:30 at night; that there was a sack of beer in the room plaintiff was in.

"He (plaintiff) said he was putting some on ice to cool for Sunday, or something like that. I told him I had a notion to call the wagon and take him and the sack of beer down and lock them up. He put up a hard luck story that Dennis was about dead with consumption and that he was going to leave town the first of the month; that he was in debt for his previous fine and owed the undertaker, and didn't want to be taken down. I told him that I would break the beer and he said I should break it, and so we carried it out and got a rock and broke it. I think there was about two dozen bottles in the sack. The beer was in a burlap sack. I think it was Leisy beer. He said he was going to quit. Plaintiff was not the only one I saw in the house. Stone Maloney was there on the couch in the other room. Plaintiff had the reputation of selling liquor. I have seen intoxicated men around in the vicinity of his place and of Dennis Maloney's at all hours of the night. I have seen persons with packages that looked like they might be beer. I could not say that it was. I searched the place at No. 612 along about the last of May or the 1st of April. We found a lot of beer in sacks and a twenty-gallon keg that was about one third full of whiskey. The beer was in sacks in a little dugout. The floor was loose, and we went down between the joists. This was in the property that belongs to Mrs. Ennis, at No. 612. We searched it at different times, but never found any liquor there before. I have not seen anyone around plaintiff's place. I have not seen plaintiff around Dennis Maloney's place since last August, except this one time. At the time I saw him at Dennis Maloney's place, he said he expected to quit and was

going to leave town. There is a path that runs from the plaintiff's place east past the rear of No. 612, to Dennis Maloney's place. It does not go any farther east than plaintiff's."

One Lightner testified that he was on the police force; that he had known plaintiff for many years; that he had searched his place and adjoining premises; that he never found any liquor in his place; that he had not searched his place in the last two years; that he searched the building at No. 612, with the chief of police, and found 12 sacks of beer in the basement of the building.

One Dickerson testified that Maloney and the plaintiff had been together bootlegging, two and a half years ago; that he never heard of True's doing anything after that.

"The house in the rear of No. 608 is Dennis Maloney's storeroom. I have seen Dennis Maloney around there. I have not seen the plaintiff around the place there when liquor was sold. Dennis Maloney has plenty of it and sells it."

Witness Harriman, testifying for the State, says:

"I bought liquor of the plaintiff when he was in the saloon business. That was a long time ago. I have not bought any of him since that time. I bought from him at Dennis Maloney's place about July or August." (It does not appear whether this was before or after the injunction. The injunction was issued on the 26th day of August.)

From the way this abstract presents this testimony, it is not clear whether the witness said he bought from Dennis Maloney or the plaintiff at Maloney's place.

This is all the testimony against the defendant.

The plaintiff herein was called in his own behalf, and testified substantially as follows:

"My wife and I have been keeping boarders. We have two table boarders and one that stays there all the time. I have a pretty bad reputation in this town, and could not get a job here. I am going away. Before I got mixed up in the bootlegging business, I was a hotel clerk, and that is what I

am trying to do again. I am a bar tender, but would rather be hotel clerk. I have had enough of the liquor business. I was at Dennis Maloney's place at the time referred to by the officer. I told the officer that Dennis wanted me to cool some beer for him for Sunday. I told the officer I was willing to do anything to keep out of trouble; that I had not done anything. He asked me if I would take the sack of beer out and break it, and I told him I would, and did so. I was engaged in the liquor business with Dennis Maloney, up to a year ago. I told the officer I had enough of it. I did not have anything to do with the raking of the path. The coal shed referred to is located out by the railroad tracks. I did not see the paths that were scratched up, and didn't know that they were there. The beer I got for Dennis Maloney was near the empty house at 612. We used to be in partnership. He asked me to come over and put some beer on ice for him. He has been sick. I have not worked for over a year.''

This is all the testimony.

It is apparent from this record that all the evidence tending to inculpate the plaintiff is circumstantial. We are asked to say that the district court erred in finding the plaintiff guilty of contempt under the record here made. This we are not able to say. The record discloses that the sack of beer found in plaintiff's home was Golden Grain Belt beer; that the liquor found in the building at the rear of No. 608 was Golden Grain Belt beer; that the beer found in plaintiff's house was in a sack; that the beer found at the rear of No. 608 was in the same kind of a sack; that there was a path leading from the rear of plaintiff's home to this building at the rear of No. 608, in which this beer was found; that the night previous to the afternoon of the search, considerable rain had fallen; that the path had been raked; apparently to obliterate tracks; that men were seen in the neighborhood of plaintiff's home frequently in an intoxicated condition; that, on the night referred to by the witness Smith, plaintiff was found at 12:30 at night in Dennis Maloney's home with 24

bottles of beer in his possession; that, when he was threatened with arrest, he consented to have the beer destroyed; that he got this beer that evening from No. 612, the place in which the officers had found 12 cases of beer and a keg of whiskey. He claims that he got it from Dennis Maloney, and was in the act of cooling it for the use of Dennis Maloney over Sunday. The sack contained 24 bottles.

The record shows that, prior to this time, he had been associated with Dennis Maloney in the bootlegging business; that Dennis Maloney had plenty of beer to sell and was selling it. He claims that, about 12:30 at night, after he had retired to sleep, he was called by Dennis Maloney to his house to get this beer and put it on ice for the use of Dennis Maloney over Sunday. He does not say that Dennis Maloney told him where to find this beer. He says he went and got it near the empty house at No. 612.

No one of these circumstances, in itself, would be sufficient to justify the action of the court; but, taking all the facts disclosed in this record, with the admission of the plaintiff, when found in possession of the liquor, "that he was going to quit and leave town", we think there was such evidence as lends the mind to an abiding conviction that the plaintiff was keeping, or aiding in the keeping of, intoxicating liquors for sale in violation of law, at and in the place described by the witnesses, and the court was right in so finding.

The judgment of the court is therefore—*Affirmed.*

EVANS, C. J., LADD and SALINGER, JJ., concur.